MEGAN L. HAYES, Wyo. Bar # 6-2891
Attorney at Law
910 Kearney Street
Laramie, WY 82070
Telephone: 307-760-6258
mlhayes@wyoming.com

BRUCE T. MOATS, Wyo. Bar # 6-3077
Law Office of Bruce T. Moats
2515 Pioneer Avenue
Cheyenne, WY  82001
Telephone: 307-778-8844
bmoats@hackerlaw.net

Attorneys for Plaintiffs Martinez, Christiansen, McCurley, Stickelman, Vallejo, McMaster and
Omanoff

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2019 DEC 16  PM 4: 15

MARGARET BOTKINS, CLERK
CHEYENNE

## IN THE UNITED STATES DISTRICT COURT, DISTRICT OF WYOMING

| | |
|---|---|
| ALONSO MARTINEZ, PHILLIP CHRISTIANSEN,) <br> KYLE R. McCURLEY, KYLE STICKELMAN,  ) <br> DAYLEN VALLEJO, TIMOTHY McMASTER,  ) <br> And DENNIS OMANOFF,                    ) <br> ) <br> Plaintiffs,                          ) <br> ) <br> ) <br> v.                                     ) <br> ) <br> TUNGSTEN PARTS WYOMING, INC.,        ) <br> INSPERITY PEOPLE SERVICES, LP, and   ) <br> JOSEPH SERY,                          ) <br> ) <br> Defendants.                          ) | CASE NO.   19-CV-256-J <br><br><br><br><br> COMPLAINT FOR <br> DAMAGES FOR WRONGFUL <br> TERMINATION, CONTRUCTIVE <br> TERMINATION AND <br> DEFAMATION <br><br> DEMAND FOR JURY TRIAL |

## INTRODUCTION, JURISDICTION AND VENUE

1.    This action is brought by Alonso Martinez, Phillip Christiansen, Kyle McCurley,

Kyle Stickelman, Daylen Vallejo, Timothy McMaster, and Dennis Omanoff (hereinafter

collectively "the Plaintiffs") to secure redress for defendants' retaliatory, wrongful or constructive termination of their employment for reporting or refusing to engage in illegal activities committed by defendants Tungsten Parts Wyoming, Inc., ("TPW") and Insperity People Services LP ("Insperity"), and for false and defamatory statements made by defendant Sery that Plaintiffs Martinez, McCurley and Stickelman had committed criminal offenses.

2.     Mr. Martinez is an individual who, at all times relevant herein, was a resident of Albany County, Wyoming.  Mr. Martinez currently resides in California.

3.     Mr. Christiansen, is an individual who, at all times relevant herein, was a resident of Albany County, Wyoming.  Mr. Christiansen currently resides in North Dakota.

4.     Mr. McCurley is an individual who, at all times relevant herein, was and is a resident of Albany County, Wyoming.

5.     Mr. Stickelman is an individual who, at all times relevant herein, was and is a resident of Albany County, Wyoming.

6.     Mr. Vallejo is an individual who, at all times relevant herein, was and is a resident of Albany County, Wyoming.

7.     Mr. McMaster is an individual who, at all times relevant herein, was and is a resident of Albany County, Wyoming.

8.     Mr. Omanoff is an individual who, at all times relevant herein, was and is a resident of Brevard County, Florida.

9.     Plaintiffs are informed and believe, and based thereon allege, that TPW is a Delaware Corporation located in Laramie, Albany County, Wyoming, and registered to do business in Wyoming.

10.     Plaintiffs are informed and believe, and based thereon allege, that Insperity is a

2

Delaware Corporation located in Kingwood, Texas, and registered to do business in Wyoming.

11.     Plaintiffs are informed and believe and based thereon allege that Insperity, as Plaintiffs' employer, and TPW, as the company where Plaintiffs' worked, are the agent, servant, employee, successor in interest, co-conspirator, co-employer, and/or alter ego of each other, and that, in doing the acts alleged herein, both defendants acted as the agent of and with the consent, knowledge, authorization and/or ratification of the other defendant herein.

12.     Plaintiffs are informed and believe and based thereon allege that TPW and Insperity were in some manner intentionally and legally responsible for the events and happenings alleged in this Complaint and for Plaintiffs' respective injuries and damages.

13.     Plaintiffs are informed and believe and based thereon allege that Defendant Joseph Sery is an individual who, at all times relevant herein, was and is a resident of Albany County, Wyoming.

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 in that the amount in controversy exceeds $75,000.00, and this civil action is between citizens of different states.

15.     Venue is proper in the District of Wyoming because TPW and Insperity are authorized to do business in Wyoming, do business in Wyoming, and the actions giving rise to the claims herein have taken place in Wyoming.

## FACTS CENTRAL TO PLAINTIFFS' CLAIMS

16. Russell Lewis and Joseph Sery are co-owners of TPW, which is a subsidiary of Tungsten Heavy Powder, Inc., d.b.a. Tungsten Heavy Powder & Parts ("THPP"), a San Diego, California-based corporation.

17. According to its website, THPP, "— with a headquarters in San Diego, California and a manufacturing facility in Laramie, Wyoming — is the largest supplier of military fragments in the world, along with fragment sub-assemblies, buffers, penetrators of all kinds, aluminum sabots and tails as well as various tungsten alloy rods." https://www.tungstenheavypowder.com/

18. Insperity provides payroll processing, related tax filing, employment eligibility verification and an array of other daily human resource administration duties for TPW.

19. At all times relevant to this Complaint, Insperity employed the Plaintiffs, who worked at TPW.

20. According to its website, in 2016, TPW completed building a 20,000 square foot "factory that currently employs about 30 people . . . " in Laramie, Wyoming. https://www.tungstenheavypowder.com/laramie/

21. TPW "is proud of the fact that all these jobs have **been brought back from China**. That just proves how much the company takes pride in American workmanship, and how much it values goods that are **'Made in the USA'."** https://www.tungstenheavypowder.com/laramie/ (emphasis in the original).

22. TPW's "modern factory combines cutting edge technology and equipment to produce high-quality tungsten parts," such as tungsten balls, tungsten cubes, buffers, warheads, and tungsten penetrators. https://www.tungstenheavypowder.com/laramie/

23. The tungsten parts that TPW purports to manufacture in Laramie include "defense articles," meaning items that have direct defense or military related applications and

are subject to the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. §§

120-130.  The U.S. Department of State's Directorate of Defense Trade Controls

(DDTC) is responsible for administering ITAR.

24. ITAR restricts and controls the import and export of defense and military related

articles and services that are on the United States Munitions List (USML) in order to

safeguard U.S. national security and further U.S. foreign policy objectives.

25. Articles, services, and related technical data that are designated as defense articles or

defense services pursuant to sections 38 and 47(7) of the Arms Export Control Act

constitute the USML and are ITAR controlled.

26. According to 22 C.F.R. § 122.1, any person who engages in the United States in the

"business of manufacturing or exporting or temporarily importing defense articles . . .

is required to register with the Directorate of Defense Trade Controls under §122.2."

27. TPW is required by ITAR to obtain approval from the DDTC before any TPW

employee or agent can export technical data to or share technical data with a foreign

person who is in the U.S. or in a foreign country, unless TPW has certified that the

proposed export or sharing of technical data is exempt from ITAR's licensing

requirements.

28. A foreign person in the U.S. who has permanent resident alien status (a green card) is

treated as if he or she is a U.S. citizen under ITAR.  However, if that foreign person is

in the U.S. and does not have permanent resident alien status, that person is a foreign

person for purposes of ITAR. That includes foreign individuals present in the U.S. on

an H1B visa, a business visa, a student visa, or no visa.

29. ITAR expressly prohibits "actual shipment[s] or transmission[s] out of the United States, including the sending or taking of . . . defense article[s] out of the United States in any manner," and the "[r]eleas[e] or . . . transfer [of] technical data to a foreign person in the United States." 22 C.F.R. § 120.17(a).

30. Dror Sery is Joseph Sery's brother.

31. On information and belief and at all times material to this Complaint, Dror Sery was an Israeli citizen, not a U.S. citizen.  On information and belief and at all times relevant to this Complaint, Dror Sery does not have permanent resident alien status in the U.S.

32. On information and belief, Dror Sery is a THPP and TPW consultant and is paid by THPP.

33. On information and belief, TPW must apply for and receive a Technical Data License issued by the DDTC for Dror Sery for each specific defense article, product or component before he can have access to drawings, prints, manufacturing processes or technical data related to each specific defense article, product or component that is subject to ITAR.

34. On information and belief, the application for a Technical Data License requires TPW to obtain permission from TPW customers before a foreign person may have access to any defense article, product or component manufactured by TPW for said customers.

35. In December of 2016, Mr. Stickelman began working at TPW as a Manufacturing Technologist.

36. Mr. Stickelman's duties at TPW included writing computer numerical control ("CNC") programs that would dictate the movement of TPW's tools and machinery, training machine operators and designing machine prototypes.

37. During his employment at TPW, Mr. Stickelman's duties included reviewing drawings of "defense articles," including designs and specifications for military-related components.

38. Mr. Stickelman was concerned that TPW was violating ITAR by, *inter alia*, allowing Dror Sery, a foreign person, to have access to TPW's secure "Sharefile" system, the system by which TPW employees could share and view electronic files containing product information regarding defense articles that were subject to ITAR.

39. Mr. Stickelman was concerned that the DDTC had not issued a Technical Data License to Dror Sery for any of the products on the Sharefile system, a license Mr. Stickelman believed Dror Sery was required to possess before he could have access to product information that was subject to ITAR.

40. On July 13, 2018, Dror Sery sent an email to several employees at TPW, including Mr. Stickelman and TPW co-owner Joseph Sery, that he would send a TPW customer's ITAR-controlled intellectual property to a company in China that manufactures balancing machines.

41. Concerned that Dror Sery's access to this ITAR-controlled intellectual property and sending it to China may be an ITAR violation, Mr. Stickelman reported it to Eric Riley, TPW's General Manager, and George Pazos, TPW's Operations Manager and TPW's ITAR "empowered individual," as that term is defined in 22 C.F.R. § 120.25.

42. On October 14, 2018, Joseph Sery emailed Dror Sery several DSG Technology company[1] drawings, information regarding those drawings, and similar drawings made by Joseph Sery.  Joseph Sery copied Mr. Stickelman on these emails. The drawings depicted the DSG 5.56-DCC, also known as the Cav-X penetrator, a defense article subject to ITAR.

43. At the time of the July 13, 2018 and October 18, 2018 emails referenced above, Mr. Stickelman was unsure if the DDTC has issued a Technical Data License to Dror Sery for DSG products.  Whenever Mr. Stickelman asked Joseph Sery if Dror Sery possessed a Technical Data License for products that were subject to ITAR, Joseph Sery would assure Mr. Stickelman that everything had been taken care of.

44. Mr. Stickelman felt uncomfortable and pressured when asked by Joseph Sery to send technical data to Dror Sery because that data was not sent through TPW's secure Sharefile system or an encrypted email system.  Additionally, Mr. Stickelman was concerned that sending ITAR-controlled technical data to Dror Sery was illegal.

45. Mr. Stickelman tried to avoid sending what he believed was information subject to ITAR directly to Dror Sery.

46. Mr. Stickelman was concerned that Dror Sery's access to information at TPW, including CNC programs, surveillance and furnace systems, and drawings of defense articles, including designs and specifications for military-related components, may violate ITAR.

---

[1] DSG Technology is a company that produces patented high-technology ammunition. https://dsgtec.com/about/

47. On several occasions, Mr. Stickelman communicated with Joseph Sery about the need to replace outdated or non-functioning equipment at TPW.  Mr. Stickelman sent Joseph Sery internet links with information on suggested replacement equipment. Joseph Sery would reject Mr. Stickelman's suggestions and instruct Mr. Stickelman to make do with TPW's existing equipment.

48. In March of 2018, Timothy McMaster began working at TPW as a Quality Assurance Technician. Mr. McMaster earned his Master of Science degree in Mechanical Engineering from the University of Wyoming in December of 2017.  He earned a Bachelor of Science degree in Mechanical Engineering from the University of Wyoming in May of 2015.

49. George Pazos was Mr. McMaster's supervisor at TPW.

50. On August 2, 2018, Philip Christiansen began working at TPW as the General Manager. Mr. Christiansen earned a Bachelor of Science degree in Electronics Engineering from Devry Institute of Technology in Phoenix, Arizona, in 1987.

51. On September 7, 2018, Daylen Vallejo began working at TPW as a Quality Engineer/Quality Assurance Technician. Mr. Vallejo had not yet obtained his undergraduate degree in engineering.

52. Mr. Vallejo's supervisor at TPW was initially George Pazos and in 2019, he was supervised by both Mr. Pazos and Plaintiff McCurley.

53. In November of 2018, Eric Riley left his employment at TPW to work for a TPW competitor, Global Tungsten Powder.

54. On January 17, 2019, Plaintiff McCurley began working at TPW as a Quality

Assurance Technician. Mr. McCurley earned his Bachelor of Science in Mechanical

Engineering from the University of Wyoming in May of 2018.

55. George Pazos was Mr. McCurley's supervisor at TPW.

56. In January of 2019, Alonso Martinez began working at TPW as a Process Engineer

Manager. Mr. Martinez earned a Bachelor of Science in Robotic Engineering (with

honors) and a Bachelor of Science in Computer Science (with honors) from

Worcester Polytechnic Institute in Worcester, Massachusetts in May of 2017.

57. Mr. Martinez had previously worked as a Programmer at THPP in San Diego from

November of 2017 to December of 2018.

58. In March of 2019, Dror Sery was provided an office at TPW, where he had full access

to TPW's ShareFile system.  Dror Sery possessed a laptop computer that had

administrative access to every file on TPW's ShareFile system, including when he

was off of TPW premises and when he was in Israel.

59. On information and belief and at all times material to this Complaint, Dror Sery's

presence at the TPW facility and his access to TPW's ShareFile system, which

housed ITAR-controlled files, violated ITAR.

60. The Plaintiffs were concerned about Dror Sery's access to TPW's ShareFile system

and his physical presence at TPW, because they believed that Dror Sery was not a

U.S. citizen and his said access to ITAR-controlled files and presence at TPW may

violate ITAR.

61. Plaintiffs Christiansen, Stickelman, McCurley, McMaster, and Vallejo were

concerned that TPW was violating ITAR by providing TPW's furnace manufacturer,

India-based FluidTherm Technology LTD, with access to TPW's source code for

TPW's furnaces. With such access, India-based FluidTherm Technology engineers

were able to, and did, change various furnace parameters, including but not limited to,

heating zone temperature parameters, cooling system parameters, gas flow rates,

manual control of entry chambers, and manual control of pusher arms.

62. On information and belief, India-based FluidTherm Technology engineers had the

same level of access as the furnace operators at TPW and as such, had the ability to

change essentially every parameter on both sintering and debinding furnaces at TPW.

If the furnace parameters changed at all, TPW was required to notify the customer.

Additionally, FluidTherm had sole control of the source codes for the sintering and

debinding and was updated in real time on every recipe change for the sintering

process of defense articles.

63. At all times relevant to this Complaint, Joseph Sery ordinarily did not allow non-

management employees to communicate directly with TPW customers.

64. TPW uses furnaces to manufacture cubes which, according to TPW's website, "are

typically used for fragments in various ammunition products.  The high density and

compactibility make them ideal to create maximum damage within a given packed

volume."  https://www.tungstenheavypowder.com/tungsten-balls-spheres-cubes/

65. During Plaintiff Vallejo's employment at TPW, from September of 2018 until July of

2019, TPW's sintering furnace was operational for approximately three months and

its debinding furnace was operational for approximately six months.

66. Plaintiffs Christiansen, Stickleman, McCurley, Vallejo and McMaster found the

working environment at TPW to be chaotic, characterized by a lack of document control and substandard, outdated equipment that had little capacity to manufacture the products ordered by TPW customers.

67. Plaintiffs Christiansen, Stickleman, McCurley, and Vallejo found it difficult to perform their jobs because Joseph Sery routinely failed to provide them with information necessary to manufacture the products ordered by TPW customers.

68. On multiple occasions during their employment, Plaintiffs Christiansen, Stickleman, McCurley, Vallejo and McMaster would receive conflicting instructions from Joseph Sery, Dror Sery, and Oscar Cruz, THPP's Chief Operating Officer and Joseph Sery's son-in-law, about how to manufacture the products ordered by TPW customers.

69. At all times relevant to this Complaint, Joseph Sery would assure various employees at TPW that he would obtain the customer's permission to allow TPW to deviate from the customer's contract with TPW.  Joseph Sery would later claim that the customer had approved the contract deviation, without providing any written evidence to support that claim, such as written amendments to existing contracts.

70. In June of 2019, a machine procured to perform the ASTM (American Society for Testing and Materials) B117, the Salt Spray Fog Test, arrived at TPW.  There was no documentation accompanying the machine to demonstrate that it conformed to the ASTM B117 standard for Salt Spray Fog testing.

71. Without the documentation described in the preceding paragraph, TPW would not be able to certify to customers that all machinery used in the entire manufacturing process conformed to ASTM standards.

72. The Salt Spray Fog Test machine procured to perform the ASTM B117 test was of substandard quality and came with a poorly translated instruction manual. TPW returned it to the seller.

73. TPW then procured a used Salt Spray Fog Test machine that was worse than the machine described in the preceding three paragraphs.  The replacement Salt Spray testing machine that arrived at TPW was inoperable:  it was heavily rusted and dirty; the hoses for the machine, used to distribute the salt solution, were full of mold because they had been stored with water inside them; and the machine had panels that were held on with bailing wire and had arrived with no documentation that it conformed to ASTM B117 standards.

74. Plaintiff Martinez was tasked with making equipment from scratch and with repairing broken equipment or inexpensive equipment made in China.  On several different occasions, Joseph Sery and Dror Sery accused Mr. Martinez of breaking the equipment that had arrived from China.

75. THPP made equipment for TPW, equipment that Plaintiff Martinez recognized could not perform the work for which it was designed.  Mr. Martinez spent more in time and materials making equipment from scratch and/or repairing equipment sent from THPP than it would have cost to purchase the same equipment brand new.

76. Contrary to its representations to the public that TPW has a 'modern factory that combines cutting edge technology and equipment to produce high-quality tungsten parts,' TPW's manufacturing equipment was substandard or inoperable and had been procured because it was cheap.

13

77. At all times relevant to this Complaint, several contracts for products ordered by TPW customers were months behind schedule.  TPW frequently obtained extensions of time to fulfill the contracts.

78. The Plaintiffs believed that TPW was unable to fulfill customer contracts in a timely manner because TPW lacked the functioning manufacturing equipment to perform its contractual obligations and because THPP purchased inferior equipment for use at the TPW facility.

79. On information and belief, in 2018 and 2019, TPW purchased tungsten products, including tungsten cubes, balls, and plates, from Xi`an Refractory & Precise Metals, Ltd, located in Xi`an, China, and from Beijing Tian-Long Tungsten & Molybdenum Co., in Beijing, China.  Oscar Cruz would verbally instruct employees working at TPW to remove all labeling and markings from any packaging of tungsten products that had arrived from China.

80. On information and belief, in 2018 and 2019, TPW would then "sell" the Chinese made tungsten products, including tungsten cubes, balls, and plates through THPP to General Dynamics and other customers, making it more difficult to trace the original source of the products.

81. The Plaintiffs were concerned selling foreign made defense articles from China to General Dynamics and other customers violated federal law.

82. The Plaintiffs were concerned that General Dynamics and other customers were not informed or aware that TPW was selling them foreign made defense articles from China, rather than products that TPW represented were manufactured in the U.S., by

TPW.

83. The Plaintiffs were concerned that TPW was deceiving General Dynamics and other customers by representing that THPP and TPW products were made in the U.S.

84. Federal law requires certain defense articles, including components and parts, to be made in the U.S.

85. Section 1211(a) of the National Defense Authorization Act for Fiscal Year 2006, Pub. L. No. 109-163, 119 Stat. 3136, 3461, prohibits the Department of Defense (DoD) from acquiring items on the USML from Communist Chinese military companies.

86. To implement section 1211 of the National Defense Authorization Act for Fiscal Year 2006, the DoD issued a rule amending the Defense Federal Acquisition Regulation Supplement ("DFARS"), effective September 8, 2006. 71 Fed. Reg. 53045.

87. The amended DFARS rule provides as follows:

> Do not acquire supplies or services covered by the [USML] (22 C.F.R. Part 121), through a contract or subcontract at any tier, from any Communist Chinese military company. This prohibition does not apply to components and parts of covered items unless the components and parts are themselves covered by the USML. 48 C.F.R. § 225.770-2.

88. "Communist Chinese military company" means any entity that is: (1) part of the commercial or defense industrial base of the People's Republic of China; or (2) owned, controlled by, or affiliated with an element of the Government or armed forces of the People's Republic of China. 22 C.F.R. § 252.225-7007.

89. On information and belief, Xi`an Refractory & Precise Metals, Ltd, and Beijing Tian-Long Tungsten & Molybdenum Co. are part of the commercial or defense industrial

base of China.

90. In November and December of 2018, TPW used Chinese-made tungsten plates with holes drilled in them in China to fulfill a customer's contract. Joseph Sery assured Plaintiffs Christiansen and Martinez that it was legal to use said Chinese-made tungsten plates to fulfill the contract.

91. During Plaintiff Martinez's and Christiansen's employment, Joseph Sery would repeatedly claim that he had consulted with the "ITAR lawyer" on ITAR questions, to make it appear that TPW was complying with ITAR and that Dror Sery was exempt from ITAR requirements.

92. On several different occasions, Plaintiff Christiansen spoke with Joseph Sery about Dror Sery's presence at the TPW facility and his access to ITAR controlled information. In response, Joseph Sery would claim that he had permission for Dror Sery to have access to ITAR controlled information. However, Plaintiff Christiansen never saw anything in writing to confirm the validity of those claims.

93. On another occasion, Plaintiff Christiansen was in a meeting with Joseph Sery when Sery telephoned a lawyer about ITAR questions. Plaintiff Christiansen could hear the lawyer disagreeing with Sery and Sery starting to argue with the lawyer. Sery then asked Christiansen to leave the room and told him later that he (Sery) had convinced the lawyer that he was correct.

94. On April 14, 2019, Joseph Sery hired Dennis Omanoff as TPW's Executive Vice President. Plaintiff Omanoff holds several patents, including one through an assignment from Dr. John Taylor for armor-piercing ammunition rounds ("AP

rounds").

95. Plaintiff Omanoff's original offer letter from TPW states that TPW could attempt to manufacture the patented armor-piercing rounds, with Omanoff collecting a five percent (5%) commission on the sales proceeds.

96. Well before Plaintiff Omanoff's tenure at TPW, Joseph Sery had designated George Pazos to act as TPW's "empowered official," as defined in 22 C.F.R. § 120.25.  As the ITAR empowered official, Mr. Pazos was authorized to sign license applications, DDTC registrations and other requests for DDTC approval on behalf of TPW, as required by ITAR.

97. As the empowered official, Mr. Pazos was required to oversee compliance with ITAR at TPW.

98. Mr. Pazos is an accountant. Mr. Pazos received no formal training before becoming the ITAR empowered official for THPP in May of 2016.  Mr. Pazos because the ITAR empowered official for TPW in October of 2017, when he began working for TPW in Laramie.

99. On numerous occasions prior to Plaintiff Omanoff's employment at TPW, Mr. Pazos raised ITAR concerns directly to Joseph Sery.

100.    In response to Mr. Pazos's concerns, Joseph Sery would threaten to fire Mr. Pazos and ensure that he would never work in a Department of Defense manufacturing facility again in his career.  Joseph Sery would also accuse Mr. Pazos of dishonesty and disloyalty.

101.    Mr. Pazos made several attempts to enforce ITAR rules on Dror Sery, which Dror

Sery refused to follow.

102.    Mr. Pazos's efforts to enforce ITAR rules on Dror Sery upset Joseph Sery, who
        regularly disregarded and dismissed Mr. Pazos's concerns about ITAR violations.

103.    In April of 2019, Mr. Pazos expressed his concerns to Plaintiff Omanoff about
        what Mr. Pazos believed were ITAR violations at TPW.  Mr. Pazos asked Mr.
        Omanoff to relieve him of the responsibility of being TPW's ITAR empowered
        official.

104.    TPW's Chief Financial Officer Chris Witt replaced Mr. Pazos as the ITAR
        empowered official in April of 2019.  Mr. Witt had no training, education or
        experience with ITAR.

105.    On May 1, 2019, at a meeting with Joseph Sery, Mr. Pazos, Plaintiffs Christiansen
        and Stickelman, and Insperity's Human Resource Administrator Cassandra Bahre,
        Plaintiff Omanoff explained that he would convene an "all hands" meeting with
        employees to announce organizational changes at TPW.

106.    At this meeting, Plaintiff Omanoff described his position as the primary
        supervisor at TPW.  Mr. Omanoff requested that everyone report to and go through
        him, in order to streamline processes and eliminate conflicting orders to employees
        from Joseph Sery, Dror Sery, and Oscar Cruz.

107.    Also at the May 1, 2019 meeting, George Pazos and Plaintiffs Stickelman and
        Christiansen raised their serious concerns about possible ITAR violations at TPW.
        For example, Mr. Pazos expressed concerns over TPW sharing ITAR-controlled
        documentation and samples with foreign nationals.  Joseph Sery acknowledged that

18

he has known for a long time that Dror Sery needs a Technical Data License and 'that

was being worked on.'

108.    In mid-May of 2019, Chris Witt, TPW's newly "empowered official" for ITAR,

attempted to understand and collect the information necessary to obtain a Technical

Data License for Dror Sery.  Mr. Witt contacted Joseph Sery, Mr. Pazos and Plaintiffs

Omanoff and Christiansen to request product information for specific defense articles

that were required by the Technical Data License application for Dror Sery.  In

response, Mr. Pazos indicated that Dror Sery's access to defense articles should be

eliminated.  However, Joseph Sery's solution was to have Dror Sery 'work through

him.'

109.    On or about May 19, 2019, Plaintiff Christiansen again raised ITAR concerns to

Joseph Sery, Mr. Witt and Plaintiff Omanoff.  Despite the fact that Mr. Witt was now

TPW's ITAR empowered official, Joseph Sery asked that the ITAR matters be left to

him because he was the only responsible officer at TPW could make ITAR-related

decisions.

110.    On or about June 24, 2019, Joseph Sery promoted Plaintiff Omanoff to Chief

Executive Officer at TPW with the following announcement:

> Dennis has demonstrated his acumen in managing all facets of the Wyoming
> operation, he has brought significant process discipline, engaged all employees
> and embarked on winning new business opportunities.  His continued leadership
> will undoubtedly increase our revenues and employment over the next months
> and years.  My plan is to make TPW a self-sufficient manufacturing facility under
> Dennis Omanoff as CEO.  Under special arrangement I have accepted a new
> development program for TPW for small caliper ammunition **utilizing Dennis'**
> **patents and expertise.**  We should all support Dennis and help him in continuing
> to evolve TPW into a World Class Company and Employer of Choice.

(Emphasis added)

19

108.     On June 24, 2019, without informing Plaintiff Omanoff, Joseph Sery hired John-Patrick Batache as the Chief Executive Officer for THPP.  Mr. Sery issued the following announcement via email to executives and managers at TPW and THPP:

>           Team THPP and TPW,
>
>           After 20 years of managing THPP and 4 years of managing TPW, as
>           CEO, I have decided to hire 2 key personnel to act as CEO of my 2
>           companies, so that I can better devote my time in the capacity of
>           Chairman. In this capacity I will be working together with potential new
>           investors in strategizing the future of the companies, expanding the
>           product lines and controlling capital expenditure. Product development
>           will remain one of my main functions and I will continue to be assisted
>           by my brother Dror Sery in his capacity as project manager. Together
>           with the assistance, other engineers and production experts, we will
>           control manufacturing processes, capital investment and project
>           priorities.
>
>           I feel that now is the right time for this move as the companies are
>           expecting a growth rate never experienced before.
>           The opportunities ahead are great and bright and with coordinated
>           teamwork we can take both companies to become major players in our
>           industry.
>
>           To that end I am relinquishing my position as CEO in THPP to John-
>           Patrick Batache and my position as CEO of TPW to Dennis Omanoff.

109.     Plaintiff McCurley turned down a position offer with the U.S. Air Force as a Civilian Aerospace Engineer on July 1, 2019.  At that time, Mr. McCurley believed Plaintiff Omanoff would improve the working environment at TPW by addressing ITAR concerns.

110.     Plaintiff Omanoff, Joseph Sery, and Mr. Batache traveled to Colorado Springs on July 10, 2019, to meet with John Taylor, the originator of Mr. Omanoff's AP rounds patent.  During the meeting, Joseph Sery asked Taylor and Omanoff to submit a patent under their names for a derivative work of an existing patented projectile. Taylor and Omanoff refused the request. At this meeting, they also discussed how

Omanoff and Taylor would be compensated by TPW for its production of the AP rounds.

111.    On the drive back to Laramie following the meeting, Joseph Sery asked Plaintiff Omanoff if it was possible to challenge the patent for the AP rounds.  Omanoff realized that Sery was trying to find a way around the patent so that he would not have to compensate Omanoff and Taylor.  Sery and Mr. Batache also openly discussed taking action against employees for raising ITAR concerns, assigning blame to employees for equipment failures, and diverting all customer contact to Batache.

112.    After returning to TPW on July 10, 2019, Plaintiff Omanoff entered a meeting with Plaintiff Christiansen and Christiansen's supervisors, including Plaintiff McCurley.  Mr. Omanoff asked them to remove all of his AP round patented items, prints and samples from TPW's production area.  Mr. Christiansen removed all such items from TPW's production area after the meeting.

113.    Plaintiff Omanoff was constructively terminated from his position at TPW on July 10, 2019.  Mr. Omanoff believed that if he continued to work at TPW, he would be required to engage in unethical and illegal activity.

114.    Later in the evening on July 10, 2019, Joseph Sery, Mr. Batache and Plaintiff McCurley were outside of Joseph Sery's residence on Bobolink Lane in Laramie, with Plaintiff Omanoff, who had been temporarily residing there and was moving out.  Mr. Omanoff told Mr. Sery that he was not licensing his AP rounds to TPW and

that TPW could not produce his patented AP rounds.  Mr. Sery responded that he

'wouldn't dream of it,' or words to that effect.

115.    At a morning meeting on July 11, 2019, with TPW managers, including Mr.

Batache, Ms. Bahre, Mike Dittrich, Ilya Pikus, and Plaintiffs Christiansen and

Martinez, Joseph Sery explained that Plaintiff Omanoff had separated from TPW but

that TPW would continue to manufacture his AP rounds.  Plaintiff Christiansen

stated that Mr. Omanoff held the patent to those AP rounds. Joseph Sery contended

that no such patent existed.  Joseph Sery then proposed meeting with each manager,

individually, to discuss where they fit into the organization after Mr. Omanoff's

departure.

116.    Following the meeting, Plaintiff Christiansen contacted Plaintiff Omanoff and

described Joseph Sery's announcement. Shortly thereafter, Joseph Sery reconvened

the meeting with Ms. Bahre, Mr. Dittrich, Mr. Pikus, and Plaintiffs Christiansen and

Martinez.  Joseph Sery asked who had informed Mr. Omanoff that TPW would

continue to make the AP rounds and removed the patented items, prints and samples

from the production area?

117.    After Plaintiff Christiansen acknowledged communicating with Omanoff and

removing the patented items, samples and prints from TPW's production area,

Joseph Sery accused Christiansen of betraying him to Omanoff and said there was no

patent.  Sery stated that Christiansen had broken his confidence and could not be

trusted.

118.    Plaintiff Christiansen informed Joseph Sery that there was a copy of the patent on
        TPW's ShareFile system and that TPW should not produce a patented product
        without Plaintiff Omanoff's permission. Joseph Sery responded that he could do
        what he wanted, with or without Omanoff's permission.

119.    Plaintiff Christiansen believed that producing the patented AP rounds without
        Plaintiff Omanoff's permission would be illegal.

120.    Joseph Sery and Mr. Batache thereafter privately informed Plaintiff McCurley of
        Mr. Omanoff's departure from TPW.  They asked Mr. McCurley if he would be
        willing to become TPW's General Manager, despite Mr. McCurley's lack of
        managerial and work experience.

121.    Plaintiff McCurley felt terrified of assuming that level of responsibility, given his
        lack of experience, but said he would accept the challenge.

122.    Joseph Sery then announced to employees at TPW that Mr. Batache would
        assume oversight of the TPW facility.

123.    Joseph Sery and Mr. Batache held several meetings on July 11, 2019, with Mr.
        Pazos and Plaintiffs McCurley and Christiansen, to determine their respective
        positions and duties at TPW.

124.    During one such meeting, Joseph Sery stated that Plaintiff McCurley would be the
        new General Manager under Mr. Batache and that Mr. Pazos would oversee quality
        at TPW.  Mr. Sery informed Mr. Pazos that if he did not want to work as the Quality
        Manager, he would no longer have a position at TPW.

125.   Plaintiff Christiansen was constructively terminated from his employment on the afternoon of July 11, 2019. Mr. Christiansen believed that if he continued to work at TPW, he would be required to engage in illegal activity.

126.   After Plaintiff Omanoff's constructive termination, Plaintiff McMaster began looking for other employment.

127.   On July 15, 2019 and again on July 16, 2019, Plaintiff McMaster called Plaintiff Omanoff, asking him to be a reference on employment applications.  During these telephone conversations, Mr. Omanoff stated his concern that TPW was violating ITAR.

128.   Prior to this conversation, Plaintiff McMaster had minimal information about ITAR violations and assumed that Joseph Sery was complying with the law.

129.   On July 17, 2019, Mr. Batache assembled an "all hands" meeting of employees at TPW.  Plaintiffs Vallejo, Martinez, McCurley and McMaster attended the meeting. Mr. Pazos announced his concerns that TPW was engaging in illegal activity, including violating ITAR by giving Dror Sery access to ITAR-controlled data and information.

130.   Mr. Batache was unable to address the concerns raised by Mr. Pazos, demonstrating to those in attendance that Mr. Batache had no working understanding of ITAR regulations and requirements.  For example, Mr. Batache claimed, incorrectly, that all management personnel at TPW were ITAR empowered officials.

131.   Mr. Batache attempted to shift the focus of the meeting by presenting an organizational chart that depicted new job titles and responsibilities for employees at TPW.  Plaintiff Vallejo learned from the organizational chart that he would no longer be a Quality Engineer/Quality Assurance Technician but instead was moved to a position working in production.

132.   George Pazos learned from the organizational chart that he would no longer be a manager at TPW.

133.   Mr. Pazos again raised his concerns over ITAR violations at TPW.  Mr. Pazos stated that all present at the meeting were witnesses and should be protected by federal whistleblower laws.  Mr. Pazos accused Mr. Batache of demoting and constructively terminating his employment. Mr. Batache was unable or unwilling to answer Mr. Pazos's questions about whether he (Pazos) was being forced to resign.

134.   Mr. Batache then noticed Mr. Pazos was recording the meeting on his mobile phone.  Mr. Batache asked Mr. Pazos to leave and had him escorted out of the meeting.

135.   After Mr. Pazos left the meeting, Plaintiffs Vallejo, McCurley, Martinez and McMaster were stunned and upset.

136.   Immediately following the meeting, Plaintiff McMaster was constructively terminated from his employment. Mr. McMaster believed that if he continued to work at TPW, he would be required to participate in illegal activity.

137.    Shortly after Plaintiff McMaster was constructively terminated from his

employment, he received the following test message from Joseph Sery:

*"Hi Tim,*

*I truly would like the opportunity to talk to you and assure you that there is no reason for your concerns regarding any claims against you or any other employee of the company. What you heard from George is 100% BS and has no merit.* ***I give you my personal guarantee that should you return to work I will secure your income for 1 year should you are [sic] terminated without cause and personally indemnify you against any claim whatsoever.*** *At least give me the opportunity to discuss it with you. I always considered you as a bright upcoming star and I have big plans for your future. I already demonstrated that I will promote from within and your future is bright with major promotions in sight. I think your decisions to resign can be overlooked and your position is secured. I'm available to discuss it with you at any time. My cell number is 858-692-3444. Thanks.*

*Joe Sery"*

(Emphasis added).

138.    Plaintiff McMaster's constructive termination was validated after he received a

message from an employee still working at TPW that Joseph Sery "is under

investigation by the FBI" because he was allowing his brother inside an ITAR

facility, Mr. Batache was prohibiting Dror Sery from coming to the TPW facility,

and that the 'whole made in America thing is a lie.'

139.    On July 21, 2019, Plaintiff McCurley sent an email to TPW co-owner Russell

Lewis, in which he detailed the events that had taken place recently at TPW and the

legal and ethical concerns McCurley had about TPW's business practices.

140.    Plaintiff Stickelman also sent an email to Russell Lewis on July 21, 2019,

regarding the condition of TPW's production and manufacturing equipment and the

inability to produce quality products.  Mr. Stickelman began his email with: "I know

George [Pazos] wrote to you about ITAR and other issues so you do not need more

from me at the moment.  I would like to raise one about ISO [International Standards Organization].  We must have the most current and detailed prints when we go into production, that is a requirement."

141.    Plaintiff Stickelman sent a second email to Russell Lewis on July 22, 2019, in which he outlined a plan to select and procure better quality production and manufacturing equipment.

142.    Plaintiff Vallejo was concerned that TPW had committed another ITAR violation when on July 23, 2019, he realized that plans, engineering drawings and specifications for a project on which he had been working had been sent to China to have a prototype made.  At that point, Mr. Vallejo did not know who to trust or speak to about his concern regarding this possible ITAR violation.

143.    Plaintiff Vallejo met with HR Administrator Bahre on July 23, 2019, to discuss his new job title and responsibilities.  Ms. Bahre informed him that he had been reassigned to be a production operator because of his knowledge of Fette press, as well as Furnace SCADA and troubleshooting. Ms. Bahre mentioned ITAR violations at TPW but assured Mr. Vallejo that the situation at TPW would improve because a new ITAR "empowered official" was in place.

144.    On July 23, 2019, Joseph Sery arrived at TPW. Mr. Sery met with Plaintiff Martinez alone in Martinez's office.  Sery told Mr. Martinez that several employees had made complaints about ITAR violations and that nothing would stop him from doing what he wanted.  Mr. Sery told Mr. Martinez that he was going to fire key personnel that day and asked Mr. Martinez if he was with him or not?

145.    Plaintiff Martinez felt that Joseph Sery was threatening his employment and out of fear, told Sery that he wished to continue working at TPW.

146.    On July 23, 2019, Joseph Sery sent George Pazos a text message that he was fired.

147.    On July 23, 2019, Joseph Sery questioned Plaintiff McCurley to see if he had sent his July 21, 2019 email to anyone else besides co-owner Russell Lewis.  Sery accused McCurley of disrupting production at TPW.

148.    Later that day, Joseph Sery called Plaintiff McCurley and his wife Annalesha, a TPW accountant, into the conference room.  Joseph Sery accused Plaintiff McCurley of attempting to disrupt production.  Sery also informed them that he had fired George Pazos because Pazos was a criminal and he was going to report Pazos to law enforcement.

149.    Joseph Sery further informed Plaintiff and Ms. McCurley that he was going to fire Plaintiff Stickelman for inciting a mutiny.

150.    Joseph Sery gave Plaintiff McCurley the choice to 'step down from being general manager or resign.' McCurley was constructively terminated from his employment and was instructed to leave the building immediately.

151.    Plaintiff McCurley believed that if he continued to work at TPW, he would be required to engage in illegal activity.  On the date of his constructive termination, Mr. McCurley's title was Quality Assurance Technician/General Manager.

152.    After meeting with the McCurleys, Joseph Sery met with Plaintiff Stickelman. Sery asked Mr. Stickelman about his employment plans. Stickelman informed Sery

that he was unhappy at TPW but would like to remain employed until he could find
another job.  Sery pressed Stickelman for an answer as to whether he (Stickelman)
intended to stay or resign his employment.  Stickelman felt Sery was pressuring him
to resign immediately and informed Sery he would respond the following day.

153.    On July 24, 2019, Joseph Sery sent Plaintiff Stickelman an email demanding to
know Stickelman's plans.  Mr. Stickelman was busy at work all day and did not
respond to the email.

154.    On July 25, 2019, Plaintiff Vallejo was constructively terminated from his
employment at TPW.  Mr. Vallejo believed that if he continued to work at TPW, he
would be required to engage in illegal activity.

155.    On July 26, 2019, at 5:48 p.m., Joseph Sery sent Plaintiff Stickelman a text
message terminating his employment.  In the text message, Sery said he would report
Stickelman to law enforcement for stealing TPW property, specifically amour-
piercing projectiles. Sery also told Stickleman: "Do not enter the premises under any
circumstances."

156.    After receiving the text message from Joseph Sery, Plaintiff Stickelman called
Robert Rice, an employee at TPW.  Mr. Rice confirmed, both on the phone and by
text message, that Stickelman had not entered TPW property after receiving the text
terminating his employment and that the amour-piercing projectiles that Sery had
accused Stickelman of stealing were "in the office area of the north plant, on the
main desk in the back right corner."

157.    Plaintiff Martinez met with Mr. Batache and Eric Nyberg, TPW's Quality and

Technology Development Manager, on August 6, 2019.  At this meeting, they
discussed Mr. Martinez's concerns over TPW's and Joseph Sery's ITAR violations,
including exporting ITAR-controlled technical data to India, China and Israel,
sending samples of defense articles to India and China, providing Dror Sery, a
foreign person, with access to ITAR controlled information, sending WhatsApp
messages to foreign individuals with exact dimensions of products subject to ITAR,
and intimidating employees at TPW into sending ITAR controlled information to
foreign persons.

158.   During the meeting described in the preceding paragraph, Mr. Batache mentioned
that Dror Sery had an exemption from ITAR requirements.  In response, Mr.
Martinez asked for proof of that exemption or permission for Dror Sery to have
access to ITAR controlled items. Mr. Batache claimed that it was 'in the works.'

159.   Plaintiff Martinez then asked Mr. Batache to send an email describing Mr.
Martinez's concerns to TPW management and all relevant employees.

160.   At 5:45 p.m., on August 6, 2019, Mr. Batache sent an email to Dror Sery, with
copies to Joseph Sery and several TPW managers, in which he described only one of
Mr. Martinez's concerns, namely that Dror Sery may have revealed proprietary
information about TPW product formulas to the vendor of a vacuum furnace.
Batache also wrote: "Alonso, please advise if there are any additional or more
specific concern [sic], and please be specifics [sic], so that corrective actions can be
addressed immediately and swiftly.  We take all concerns very seriously, and we are
committed to sustain a fully compliant operation."  Batache assured everyone that
"TPW will adhere to all Export and ITAR regulations . . . ."

161.   At 6:08 p.m., on August 6, 2019, Joseph Sery sent the following email: "Ok guys **unless this stops immediately I'll have to take a more serious approach**. This is the last time the word ITAR appears on an email when it concerns me or Dror. If anyone has an issue with this just let me know now!!!!" (Emphasis added).

162.   After receiving this email, Plaintiff Martinez believed that Joseph Sery was going to fire him.

163.   On August 7, 2019, Plaintiff Martinez filed a written complaint with HR Administrator Bahre and Aaron Lechner at Insperity's office in Kingwood, Texas. Mr. Martinez sent his written complaint directly to Mr. Lechner because he did not trust Ms. Bahre to provide a copy of his complaint to Insperity officials in Texas.

164.   In his complaint, Plaintiff Martinez recounted his ITAR concerns, provided a copy of the email from Joseph Sery the preceding day, described the complaints raised by George Pazos on July 17, 2019, and explained that Sery had fired or forced out key personnel in the past two weeks and had previously threatened Mr. Martinez's employment on July 23, 2019.

165.   At a meeting with HR Administrator Bahre, Plaintiff Martinez refused to sign TPW's August 8, 2019 response to his formal complaint. During the meeting with Ms. Bahre, she agreed that Joseph Sery's August 7, 2019 email appeared to threaten Martinez's employment.

166.   Plaintiff Martinez then wrote and submitted a second memorandum that explained why TPW's response to his complaint was completely inadequate because it failed to address the ITAR concerns he had raised.

31

167.    Over the noon hour on August 8, 2019, Mr. Martinez went to a medical clinic,

seeking treatment for anxiety, stress, weight and sleep loss.  His medical provider

gave him a note to take five days of sick leave.

168.    Before leaving work on the evening of August 8, 2019, Plaintiff Martinez noticed

that his access to current TPW files had been restricted.  He submitted his doctor's

note to Ms. Bahre via email at 6:30 p.m., and left the facility.

169.    On August 12, 2019, while Plaintiff Martinez was still out on sick leave, several

law enforcement officers, including an FBI agent, arrived at his home.  They seized

his TPW-issued laptop computer and hard drives and threatened to get a search

warrant.  The officers were aggressive and threatening and claimed that Mr. Martinez

had improperly downloaded TPW files to his personal computer.  They also said he

had destroyed TPW property.

170.    Plaintiff Martinez's access to current TPW files had been restricted on August 8,

2019.  He had not illegally or improperly downloaded TPW files and did not own a

personal computer.

171.    Plaintiff Martinez was distraught over the accusations and the law enforcement

officers' threatening conduct.  He gave them his cell phone number and his address

in California.  He left for California later that evening.

172.    HR Administrator Bahre sent Plaintiff Martinez a letter at his California address,

informing him that he was fired, effective August 12, 2019.

173.    On September 1, 2019, law enforcement officials arrived at Plaintiff Stickelman's

residence.  They questioned Mr. Stickelman about Plaintiff Martinez, Mr. Martinez's

computer, and what happened at TPW. They told Mr. Stickelman that Joseph Sery had accused Stickelman and other former employees of disposing of company property, specifically tungsten power.

174.    On September 1, 2019, law enforcement officials arrived at Plaintiff McCurley's residence. They questioned Mr. McCurley about ITAR violations at TPW, about Plaintiff Martinez, and asked if Mr. Martinez had sent anything to Mr. McCurley.

175.    Plaintiff McCurley described the ITAR violations he believed had occurred during his employment at TPW.

176.    On information and belief, Joseph Sery or his agents, including managers or supervisors at TPW, told one or more persons that Plaintiff Martinez was on the run from the FBI and had stolen TPW files.

177.    On information and belief, Joseph Sery or his agents, including managers or supervisors at TPW, told one or more persons that Plaintiff Martinez had destroyed TPW company property.

178.    On information and belief, Joseph Sery or his agents, including managers or supervisors at TPW, told one or more persons that Plaintiffs McCurley and Stickelman had stolen or destroyed TPW company property.

179.    On information and belief, Joseph Sery sent an email to Jaynea Lechliter, a Program Manager at Northrop Grumman Corporation, informing her that he had fired Plaintiff Omanoff because he had "created a mutiny inside the company" and that George Pazos had "committed a crime."

180.    At a contested and recorded hearing in the State of Wyoming, Unemployment

Compensation matter entitled, *Martinez v. Insperity Peo Services, LP*, Appeal No.
UC-1002039, Joseph Sery testified under oath that he was aware of a federal
investigation and that his lawyers were meeting with federal investigators that day,
October 15, 2019, as part of an investigation into alleged illegalities at TPW.

181.    The Plaintiffs repeat and reallege the allegations of paragraphs 1 through 180,
inclusive, and incorporate the same by reference as though set forth fully herein for
all causes of action set forth below.

**COUNT 1. Cause of Action: Wrongful Termination of Plaintiffs Martinez and
Stickelman, in Violation of Public Policy against Defendants TPW and Insperity.**

182.    Defendants TPW and Insperity, through their owners, agents, managers or
supervisors, discharged Plaintiffs Martinez and Stickelman in violation of the well-
established public policy that protects employees, who assert their right to express
concerns over perceived and on-going violations of the law committed by their
employer, from retaliation or discharge.

183.    At all times relevant hereto, Defendants TPW and Insperity had actual and
constructive knowledge of the conduct described in the preceding paragraph.

184.    Because Plaintiffs Martinez and Stickelman were fired after expressing concerns
to their employer about perceived and on-going violations of the law at TPW, they
have no other remedy available to them now but to bring this claim for wrongful
termination.

185.    As a direct and proximate result of Defendants' actions, Plaintiffs Martinez and
Stickelman have suffered and will continue to suffer pain and suffering, and extreme
and severe mental anguish and emotional distress; and they have suffered and will
continue to suffer a loss of earnings and other employment benefits and job

opportunities. Plaintiffs Martinez and Stickelman are therefore entitled to general and compensatory damages in amounts to be proven at trial.

**COUNT 2. Cause of Action: Constructive Termination of Plaintiffs McMaster, McCurley, Vallejo, Christiansen and Omanoff against Defendants TPW and Insperity.**

186.    Defendants TPW and Insperity, through their owners, agents, managers, or supervisors, constructively terminated Plaintiffs McMaster, McCurley, Vallejo, Christiansen and Omanoff from their employment at TPW by creating intolerable working conditions that were so unusually adverse that reasonable employees in their position would have felt compelled to resign.

187.    At all times relevant hereto, Defendants TPW and Insperity had actual and constructive knowledge of these Plaintiffs' intolerable working conditions, including requesting or requiring Plaintiffs McMaster, McCurley, Vallejo, Chistiansen and Omanoff to participate in unethical and/or illegal activity at TPW as a condition of their continued employment.

188.    As a direct and proximate result of Defendants' actions, Plaintiffs McMaster, McCurley, Vallejo, Christiansen and Omanoff have suffered and will continue to suffer pain and suffering, and extreme and severe mental anguish and emotional distress; and they have suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities. Plaintiffs McMaster, McCurley, Vallejo, Christiansen and Omanoff are therefore entitled to general and compensatory damages in amounts to be proven at trial.

**COUNT 3. Cause of Action: Defamation of Plaintiffs Martinez, Stickelman, McCurley and Omanoff against Defendant Sery.**

189.    Defendant Joseph Sery, or agents acting on his behalf, including managers or

supervisors at TPW, made false and defamatory statements to third parties, including

law enforcement officials and Insperity employees, that Plaintiffs Martinez,

Stickelman and McCurley had engaged in criminal conduct, including illegally

downloading TPW files to a personal computer, destroying TPW property, and

stealing TPW property.

190.    The statements described in the preceding paragraph are defamatory *per se*

because they falsely accuse Plaintiffs Martinez, Stickelman and McCurley of having

committed crimes.

191.    Joseph Sery, or agents acting on his behalf, including managers or supervisors at

TPW, made the statements described above in paragraph 189 with actual malice.

The statements imputing criminal offenses to these Plaintiffs were made with

knowledge that they were false or with reckless disregard of whether the statements

were false or not; said statements were published without reasonable grounds for

belief in their truth and in retaliation for the Plaintiffs' expressing concerns about

illegal activity by Joseph Sery and TPW.

192.    Joseph Sery, or agents acting on his behalf, including managers or supervisors at

TPW, made false and defamatory statements to third parties, including Jaynea

Lechliter, a Program Manager at Northrop Grumman Corporation, that disparaged

and defamed Plaintiff Omanoff, thereby harming his reputation and standing in the

eyes of other defense industry professionals.

193.    As a direct and proximate result of Defendants' actions, Plaintiffs Martinez,

Stickelman, McCurley, and Omanoff have suffered and will continue to suffer pain

and suffering, extreme and severe mental anguish and emotional distress, and

damage to their reputations. Plaintiffs Martinez, Stickelman, McCurley, and Omanoff are therefore entitled to general, compensatory and punitive damages in amounts to be proven at trial.

WHEREFORE, the Plaintiffs pray for judgment against Defendants TPW, Insperity and Joseph Sery as follows:

a. For compensatory damages according to proof;

b. For punitive damages according to proof;

c. For back pay and reinstatement or front pay;

d. For injunctive relief;

e. For reinstatement;

f. For attorney and expert witness fees as allowed by statute;

g. For pre-judgment interest at the maximum legal rate;

h. For interest on the judgment at the maximum legal rate;

i. For costs of the suit herein; and

j. For such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Plaintiff requests a jury trial on all issues and claims raised in this Complaint.

Respectfully submitted this _16th_ day of December, 2019.

By: _Bruce T. Moats_

Bruce T. Moats
Law Office of Bruce T. Moats
2515 Pioneer Avenue
Cheyenne, WY  82001
(307)778-8844
bmoats@hackerlaw.net

By: _Bruce T. Moats for_

Megan L. Hayes
Attorney at Law
910 Kearney Street
Laramie, WY  82070
(307) 760-6258
mlhayes@wyoming.com

Attorneys for Plaintiffs Martinez, McCurley, McMaster, Stickelman, Vallejo, Christiansen and Omanoff.